

EOD
02/08/2021

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JOSEPH JAMIESON** | § | Case No. 19-41433 |
| xxx-xx-8741 | § | |
| | § | |
| Debtor | § | Chapter 7 |
| | § | |

| | | |
|---|---|---|
| WADE PARKIN and | § | |
| CANDYE PARKIN | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 19-4073 |
| | § | |
| JOSEPH JAMIESON | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint filed by the Plaintiffs, Wade and Candye Parkin ("Plaintiffs"), in the above-referenced adversary proceeding, seeking a determination that the indebtedness due and owed by the Defendant, Joseph Jamieson ("Defendant"), should be rendered nondischargeable, the Court issues the following findings of fact and conclusions of law. The Plaintiffs contend that the judgment debt owed to them is nondischargeable as a debt obtained by false pretenses, a false representation or actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A). After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

# **FINDINGS OF FACT**[1]

1. The Plaintiffs, Wade Parkin and Candye Parkin, are individuals (the "Plaintiffs") who reside in Oregon.[2]

2. The Plaintiffs desired to obtain a deluxe automated safety hitch system to assist in the transport of their towable recreational vehicle. They desired a customized unit that would bring greater stability by extending the wheel base and improved braking and steering capabilities.[3]

3. Based upon their subsequent research regarding the rare sources from which such specialized equipment can be procured in the United States, the Plaintiffs learned of Automated Safety Hitch, Inc. ("ASH, Inc.") of Sanger, Texas and its president, Joseph P. Jamieson ("Jamieson" or the "Debtor").

4. ASH, Inc. had been engaged in the production of custom-made safety hitches since 2008.

5. Jamieson was at all relevant times the sole owner and president of ASH, Inc.[4]

6. As the owner and president of ASH, Inc., Jamieson had full authority to accept the order of the Plaintiffs and to bind ASH, Inc. to its contractual terms.

7. Jamieson was acting in his capacity as a corporate officer of ASH, Inc. during all of his interactions with the Plaintiffs.

8. Jamieson was the sole contact for the Plaintiffs in this transaction.[5]

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

[2] Paragraph V(b) of the Stipulated Statements of Fact (hereafter cited as "Stipulated Facts") set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on August 28, 2020 [dkt #30].

[3] See Ex. 10 and 11 (photographs taken from the ASH, Inc. website).

[4] Stipulated Fact ¶ V(a).

[5] Stipulated Fact ¶ V(d).

9.  In an initial phone call with Jamieson on August 30, 2017, one of the Plaintiffs, Wade Parkin ("Parkin"),[6] communicated to Jamieson the type of product in which he and his wife were interested and he notified Jamieson at that time that the Plaintiffs were needing delivery of the finished product on or before a strict deadline.

10. Jamieson assured Parkin that ASH, Inc. could fabricate such a product within the desired time frame.[7]

11. In response to this initial conversation, ASH, Inc. forwarded an invoice (the "Invoice") to the Plaintiffs that itemized the cost of the basic unit to be crafted by ASH, Inc., together with an itemization of the additional costs of all of the options which the Plaintiffs had requested,[8] including a customized paint job.[9]

12. Parkin testified that he viewed the Invoice as an offer from ASH, Inc.—an offer that he and his wife accepted.

13. The Invoice specified a total price of $13,580.00, with one-half of the proposed cost designated as the "Normal First payment at time of order."[10]

14. The Invoice further specified that the "Normal Balance [would be] due when [the] unit goes to paint."[11]

15. Notwithstanding the clear language regarding payment terms contained in the Invoice, the Plaintiffs contend that the parties had agreed in the initial conversation that the payment of the remaining $6,790 balance by the Plaintiffs would not be due until they accepted delivery of the unit upon its completion. The Defendant disputes that contention.

---

[6] Mr. Parkin was the only plaintiff to testify at trial.

[7] Stipulated Fact ¶ V(c).

[8] Ex. 1.

[9] Stipulated Fact ¶ V(c). Jamieson testified that, in the absence of the selection of a special color as an option, the ASH units were painted black.

[10] Ex. 1.

[11] *Id.*

16. The Invoice further specified that, pursuant to the parties' agreement, "[t]his order is contingent on unit completion on or before 5 Oct. [20]17."[12]

17. Despite the fact that the terms of the Invoice specified that the second payment would be due "when the unit goes to paint," the Plaintiffs "accepted the offer" on August 31, 2017, by wiring $6,790.00 to ASH, Inc.[13]  This was 50% of the designated price for the custom product.[14]

18. Parkin next communicated with the Defendant on or about September 24, 2017.

19. On that date, Parkin sent an e-mail to Jamieson in which he outlined their travel plans from their home in Oregon to Sanger, Texas and conveyed that the Plaintiffs were expecting installation in Sanger on October 6 because they needed "to be at the RV factory in Elkhart, Indiana on [or] about the 8th to take delivery of our trailer."[15]

20. Jamieson responded a few hours later by noting:  "Progressing nicely.  Axle will likely be set in place tomorrow afternoon or Tuesday morning."[16]

21. Parkin and Jamieson also spoke by telephone during that general time period, although the precise timeline was not presented to the Court.

22. The tenor of the phone conversation was similar to the e-mail exchange.  Jamieson confirmed that progress was occurring on the product and that ASH, Inc. would be capable of meeting the Plaintiffs' delivery deadline.[17]

23. Jamieson further testified that he informed Parkin during the telephone conference that the second payment was due because the unit was being tendered for the customized paint job.  Parkin disputes that Jamieson ever made such a payment demand.

---

[12] *Id*.

[13] Ex. 2 and 3.

[14] Stipulated Fact ¶ V(e).

[15] Ex. D at 2.

[16] *Id*. at 4.

[17] *Id*. at 5 (Sept. 25 email confirming ability to meet the deadline).

24. There was no further contact between the parties until the Plaintiffs arrived at the ASH, Inc. facility on the morning of October 5, 2017.[18]

25. The parties respectively offer quite divergent descriptions of the October 5 events.

26. The Plaintiffs were not satisfied with the product that was presented on that date.[19]

27. The Plaintiffs claim that there was no product ready to be installed upon their truck upon their arrival and that they found the ASH, Inc. facility "somewhat in disarray" with no observable employees on site other than Jamieson and an office receptionist.

28. The Parkins were not satisfied with the product that was presented on that date.[20]

29. Parkin testified that he saw what he characterized as a black "demonstration hitch" which he did not think was a completed unit and that there were also a few damaged hitches also sitting on the property.

30. Upon seeking an explanation as to why the ordered hitch was unavailable, Parkin testified that Jamieson told him that the company's CFO "didn't allow" production to proceed because the second half payment had not been made by the Plaintiffs.

31. ASH, Inc. had no chief financial officer.

32. Jamieson testified that a completed black unit was available and ready to be installed on October 5 once the Plaintiffs' vehicle became available, but that it had not been painted in the requested brown color because the Plaintiffs had failed to tender the second payment at the painting stage pursuant to the Invoice terms and the company's internal procedures.

33. Jamieson denied that he had referenced any prohibition by any "CFO," though he admitted that the payment requirement regarding custom painting had been suggested as a sound business practice by his long-time accountant, Dan Lassiter.

34. It is credible that, in a manner consistent with the terms of the Invoice between the

---

[18] Stipulated Fact ¶ V(f).

[19] *Id*.

[20] *Id*.

parties, ASH, Inc. had a policy that would require final payment before a generic unit is customized to a degree that would have limited its marketability in the event that an ordering customer elected not to complete the sale.

35. Throughout the day on October 5, the parties continued to deal with each other. As characterized by Parkin at trial, "we were still interested in purchasing the product" at that time.

36. The continued possibility of an agreement on October 5 is verified by the fact that, toward the end of the afternoon, a local welder came to the ASH shop and was authorized by the Plaintiffs to remove the bumper from their Ford truck as a prelude to a hitch installation.

37. The Plaintiffs contemplated their options during the evening on October 5.

38. The Plaintiffs still desired to acquire the safety hitch prior to their trip to Elkhart, Indiana to obtain delivery of a new fifth-wheel recreational vehicle.

39. However, the evening hours on October 5 brought the Plaintiffs to the realization that they did not want to complete a purchase from ASH, Inc.

40. On the morning of October 6, the Plaintiffs sent a notice of rescission to ASH, Inc. and issued a written demand for the return of their $6,790 deposit.[21]

41. The Plaintiffs returned to the ASH, Inc. facility for the reattachment of their bumper and to make a personal request for the return of the deposit.

42. Jamieson testified that the installation of the entire (black) unit could have been accomplished by ASH, Inc. on that second day. He claimed that all that was needed was access to the Plaintiffs' vehicle because of the welding requirements.

43. No evidence from an independent source either confirms or contradicts either party's version of the events.

44. The Plaintiffs refused to go forward and demanded the return of their deposit.

45. The Defendant continued to seek the Plaintiffs' acceptance of the black unit since, according to Jamieson, it was the Plaintiffs' fault that the proposed unit had not

---

[21] Ex. E.

been painted brown due to their failure to tender the second half of the required payment pursuant to the Invoice.

46. However, Jamieson informed the Plaintiffs that ASH, Inc. did not have the available financial means to refund the deposit immediately.

47. The Plaintiffs were instead presented that morning with a proposed agreement which Jamieson asked them to sign. Signed by Jamieson in both his corporate and individual capacities, the document read:

> To whom it may concern:
>
> Wade and Candeye (sic) Parkin deposited $6,937.00 into a bank account for the (sic) Automated Safety Hitch. On 10/5/2017, Mr. and Mrs. Parkin's (sic) decided they did not want the unit that was prepared for them. They are entitled to refund of the deposit minus man hours spent on removing and reinstalling the bumper giving access to the hitch that needed modification. Automated Safety Hitch will provide the best effort to deliver the remaining refund within 45 days of this agreement.[22]

48. The Plaintiffs refused to sign the proposed agreement because they did not believe that there had been any "unit that was prepared for them," but rather that ASH, Inc. had failed to produce the unit that they had contractually agreed to buy.

49. At that point, at least a temporary impasse had been reached, although conversations between the parties regarding the acquisition of a safety hitch would continue for weeks.

50. The impasse had arisen because the Plaintiffs at that point would have never agreed to tender the second payment prior to receipt of the actual brown unit that they had ordered and ASH, Inc. at that moment would have never proceeded with that customized model without receipt of the second payment in advance from the Plaintiffs.

51. Jamieson transported a safety hitch to Elkhart, Indiana, in the subjective hope of convincing the Plaintiffs to accept the black unit temporarily until a painted unit

---

[22] Ex. C.

could be exchanged for it. However, no substantive discussions took place in Indiana.

52. Within a week, in response to further entreaties from the Defendant to return to Texas to complete the deal, Parkin e-mailed Jamieson the following message on October 11:

> Joe:
>
> We have decided to hold off a bit and not incur the additional 1000 miles to go back to Sanger at this point. We will be heading from Palm Springs, California to Orlando, Florida the first of December, and it would seem to make much more sense to stop by Sanger then.
>
> How much lead time would you need from us, before we headed that way from California?
>
> I am getting my hitch and airbags installed tomorrow, and will get a Curt 25k hitch.
>
> Wade[23]

53. Jamieson responded hopefully the next day: "Two weeks. Your unit went to the paint shop yesterday."[24]

54. However, Parkin immediately responded: "I would advise waiting to move forward until we know exactly how and what we are doing."[25]

55. In a separate e-mail a few minutes later, Parkin stated to Jamieson:

> We will let you know when or if we want to proceed. We are installing a hitch and air ride on the truck today, and will see how things work on our way back to Oregon next week.[26]

---

[23] Ex. F at 2.

[24] *Id.* at 1.

[25] *Id.*

[26] Ex. G at 2.

56. A few weeks later, on November 17, 2017, the discussions came to a formal halt:

    > Mr. Jamieson:
    >
    > We have decided NOT to move forward at this point.
    >
    > Please return our deposit as per our previous agreement.
    >
    > We have not ruled out a purchase in the future, but if we do decide to move forward at some point, we will start the process again. Thank you.[27]

57. By January 2018, the parties' communications devolved from possible resolution to threats of litigation.[28]

58. The Plaintiffs initiated litigation against the Defendant in 2018 in an action before the 442nd Judicial District Court in and for Denton County, Texas, in a case styled *Wade Parkin and Candye Parkin v. Automated Safety Hitch, Inc. and Joseph P. Jamieson* under cause no. 18-4862-442 (the "State Court Litigation").[29]

59. Neither Defendant answered the allegations nor made any other appearance in the State Court Litigation.[30]

60. Based upon a finding that service had been properly accomplished upon the Defendants,[31] the state court rendered and signed a Default Judgment (the "State

---

[27] *Id*. at 1.

[28] Ex. H.

[29] Stipulated Fact ¶ V(g).

[30] *Id*.

[31] The Defendant attempted to raise before this Court issues regarding the propriety of service in the State Court Litigation. This Court is certainly precluded from hearing any of those complaints by the *Rooker-Feldman* doctrine, which prevents lower federal courts from reviewing a state court decision when the issues raised in the federal court would be "inextricably intertwined" with a state court judgment and the federal court would, in essence, be called upon to review the state court decision. *Davis v. Bayless*, 70 F.3d 367, 375-76 (5th Cir. 1995) (*citing United States v. Shepherd*, 23 F.3d 923, 924 (5th Cir. 1994)). A claim entertained by a lower federal court is "inextricably intertwined" with those addressed in the state court "whenever the relief requested in the federal action would effectively reverse the state court decision or void its ruling." *In re Popkin & Stern*, 259 B.R. 701, 706 (B.A.P. 8th Cir. 2001)

Court Default Judgment") on November 27, 2018.[32]

61. The State Court Default Judgment granted judgment in favor of the Plaintiffs and against ASH, Inc. and Jamieson, jointly and severally, in the amount of $21,753.22, plus an attorney's fee award of $3,540.00.[33]

62. No evidentiary hearing was conducted by the state court with regard to the entry of the State Court Default Judgment.

63. No specific findings of fact were issued by the state court in support of the State Court Default Judgment.

64. The state court stated in the State Court Default Judgment that it had "read the pleadings and the papers on file and is of the opinion that the allegations as to liability contained in the Plaintiffs' First Amended Petition have been admitted."[34]

65. The Plaintiffs failed to establish that any facts sought to be litigated in this adversary proceeding were fully and fairly litigated in the State Court Litigation.

66. On May 29, 2019, Jamieson filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Sherman Division of this Court.

67. The claim of the Plaintiffs was properly scheduled as an unsecured claim in an unknown amount in the Defendant's bankruptcy case.[35]

---

(*quoting Bechtold v. City of Rosemount*, 104 F.3d 1062, 1065 (8th Cir. 1997)); see also *Weaver v. Texas Capital Bank N.A.*, 660 F.3d 900, 904 (5th Cir. 2011) [observing that "as we have noted in other cases, the *Rooker–Feldman* doctrine generally applies only where a plaintiff seeks relief that directly attacks the validity of an existing state court judgment"]. Thus, the doctrine generally demands that "judicial errors committed in state courts are for correction in the state court systems" through the appellate process. *Hale v. Harney*, 786 F.2d 688, 691 (5th Cir. 1986).

[32] Ex. 9.

[33] *Id.*

[34] *Id.* at 1.

[35] Schedule F filed by the Debtor on July 15, 2019 [dkt #16] in case no. 19-41433. No explanation is provided as to why the debt was listed in an unknown amount. Due to the Notice of No Distribution issued by the Chapter 7 trustee in the underlying case, no proofs of claim were ever solicited from creditors.

68. On August 21, 2019, the Plaintiffs filed their original complaint in this adversary proceeding, seeking a determination that the indebtedness established by the State Court Default Judgment should be rendered nondischargeable under the provisions of 11 U.S.C. § 523(a)(2)(A).

69. The Defendant did not actually contest the legitimacy of the underlying indebtedness owed by ASH, Inc. to the Plaintiffs arising from the unrefunded deposit.

70. The indebtedness evidenced by the State Court Default Judgment is still due and owing by the Defendant to the Plaintiff.

71. In judging the credibility of the two party-witnesses in this dispute, nothing significantly favors the adoption of one side's testimony over the other.

72. Neither side presented any objective evidence from any independent source that would corroborate its version of this dispute.

73. The Court would note that the Defendant is not a particularly engaging fellow. He certainly may be a brilliant engineer, but he conveys a brusque, impatient personality that is not particularly customer-oriented nor indicative of any particular savviness regarding business or marketing practices.

74. The evidence suggests that, at least at the time of this transaction, the Defendant ran a "no-frills" business operation with the use of independent contractors which he engaged as needed in order to produce a particular product at a particular time.

75. One might suspect that financial distress could be a plausible explanation for the Defendant's failure to produce the unit—plausible but not proven. Such a conclusion would be sheer speculation based on this evidentiary record.

76. Other than the failure to tender the refund to the Plaintiffs, the record fails to present any evidence that the Defendant or his company was suffering from significant financial distress at the time of the transaction or that establishes other circumstances that could corroborate the existence of a fraudulent intent as alleged by the Plaintiffs.

77. The Plaintiffs have failed to establish by a preponderance of the evidence that the indebtedness evidenced by the State Court Default Judgment was procured under circumstances constituting actual fraud.

Document      Page 12 of 19

78. The Plaintiffs failed to prove by a preponderance of the evidence that, at the time of the contract was formed between the Plaintiffs and ASH, Inc., the Defendant's company was incapable of performing the obligations of the contract as promised.

79. The Plaintiffs failed to prove by a preponderance of the evidence that, at the time of the contract was formed between the Plaintiffs and ASH, Inc., the Defendant had no intention of allowing his company to perform the obligations of the contract as promised.

80. The Plaintiffs failed to prove by a preponderance of the evidence that the Defendant made an oral representation that the second payment under the Invoice would be required from the Plaintiffs only upon the delivery of the final product.

81. Such a contention is directly contradicted by the express terms of the Invoice reflecting the terms which the Plaintiffs accepted and which they now seek to enforce with the sole exception of the second payment requirement.

82. The Plaintiffs have failed to establish by a preponderance of the evidence that, at the time that the contract was formed between the Plaintiffs and ASH, Inc., the Defendant made representations to the Plaintiffs regarding his company's ability to produce the requested safety hitch by October 5, 2017 that such Defendant knew were false at the time that such representations were made.

83. The Plaintiffs failed to prove by a preponderance of the evidence that the Defendant's representation on behalf of his company that one-half of the designated purchase price of the safety hitch was sufficient to initiate work was false.

84. The Plaintiffs have failed to establish by a preponderance of the evidence that the Defendant otherwise made knowingly false representations to the Plaintiffs with the specific intention and purpose of deceiving them.

85. The Plaintiffs have failed to establish by a preponderance of the evidence that the Defendant, on behalf of his company, appropriated any funds from the Plaintiffs with a fraudulent intent.

86. The fact that ASH, Inc. ultimately failed to deliver a completed safety hitch to the Plaintiffs on October 5, 2017 was, at most, a breach of contract by ASH, Inc.

87. While the circumstances demonstrate a financial loss to the Plaintiffs, thereby placing the Plaintiffs in a sympathetic light, such sympathy cannot be permitted to

stand in lieu of the required degree of proper proof pertaining to the Defendant's conduct and intentions under these circumstances, particularly in light of the Bankruptcy Code's directive that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor.

88. To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## **CONCLUSIONS OF LAW**

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1334. This Court has personal jurisdiction over the parties to this adversary proceeding.

2. This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b) (2)(I) and (O) and meets all constitutional standards for the proper exercise of judicial power by this Court.

3. In seeking to except the debt owed to them from the scope of the Debtor-Defendant's discharge, the Plaintiffs assume the burden of proof under a preponderance of the evidence standard. *Grogan v. Garner,* 498 U.S. 279, 286 (1991).

4. "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." *FNFS, Ltd. v. Harwood (In re Harwood),* 637 F.3d 615, 619 (5th Cir. 2011) (citing *Hudson v. Raggio & Raggio, Inc.* (*In re Hudson*)*,* 107 F.3d 355, 356 (5th Cir. 1997)).

5. The fact that there is a judgment debt due and owing by the Defendant to each of the Plaintiffs is established by the State Court Default Judgment.

*Collateral Estoppel*

6. "Collateral Estoppel or, in modern usage, issue preclusion, 'means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Schiro v. Farley*, 510 U.S. 222, 232 (1994) (internal quotations omitted).

7. In other words, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. U. S.*, 440 U.S. 147, 153 (1979) (*citing Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5 (1979)).

8. "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153-54.

9. In the bankruptcy dischargeability context, the Fifth Circuit stated in *Fielder v. King* (*In re King*)*,* 103 F.3d 17, 19 (5th Cir. 1997):

    > Issue preclusion will prevent a bankruptcy court from determining dischargeability issues for itself only if 'the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question . . . and the facts supporting the court's findings are discernible from that court's record. *Dennis v. Dennis* (*Matter of Dennis*)*,* 25 F.3d 274, 278 (5th Cir. 1994) ["Collateral estoppel applies in bankruptcy courts only if, inter alia, the first court has made . . . factual findings on the identical dischargeability issue in question – that is, an issue which encompasses the same prima facie elements as the bankruptcy issue."].

10. Thus, while the doctrine of issue preclusion applies in bankruptcy dischargeability litigation, a bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991).

11. When an issue that forms the basis for the creditor's theory of nondischargeability has been actually litigated in a prior proceeding, neither the creditor nor the debtor may re-litigate those grounds. *RecoverEdge, L.P. v. Pentecost,* 44 F.3d 1284, 1294 (5th Cir. 1995).

12. To the degree that the Plaintiffs are seeking to impose a preclusive effect arising from the entry of the State Court Default Judgment, the Plaintiffs have the burden of proof on all elements of collateral estoppel.

13. Federal courts look to the principles of issue preclusion utilized by the forum state in which the prior judgment was entered. *Schwager v. Fallas* (*In re Schwager*), 121 F.3d 177, 181 (5th Cir. 1997).

14. Because the State Court Judgment against the Defendant was entered in a Texas state court, this Court applies the Texas law of issue preclusion. *Ingalls v. Erlewine* (*In re Erlewine*), 349 F.3d 205, 210 (5th Cir. 2003); *Gober v. Terra + Corp. (In re Gober*), 100 F.3d 1195 (5th Cir. 1996).

15. Under Texas law, a party is collaterally estopped from raising an issue when: (1) the facts sought to be litigated in the second case were fully and fairly litigated in the first; (2) those facts were essential to the prior judgment; and (3) the parties were cast as adversaries in the first case. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex. 1984), *Cannon v. Texas Independent Bank*, 1 S.W.3d 218, 224 (Tex. App. – Texarkana 1999, pet. denied).

16. With regard to the first factor, "actual litigation occurs when an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985) (internal quotations omitted) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. (d) (1982)).

17. Under a "no-answer default judgment," "it is said that the non-answering party has admitted the facts properly pled and the justice of the opponent's claim." *Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979) (internal quotations omitted).

18. Based upon the *Stoner* definition, the Fifth Circuit has observed that "[c]ourts generally hold that no-answer default judgments fail to meet the 'actually litigated' prong of the issue preclusion test." *Gober,* 100 F.3d at 1204 (citations and internal quotations omitted).

19. As one court recently explained,

> By its very nature, the first element – "full and fair litigation" of relevant facts – requires actual litigation of such facts, and as a general rule, an issue is "actually litigated" only when it is properly raised by the pleadings, submitted for a determination, and actually determined. With this in mind, because under Texas law a defendant who fails to answer a state court petition is deemed to have admitted all properly pled factual allegations within the petition with respect to

>>liability, courts generally hold that no-answer default judgments fail to meet the "actually litigated" prong of the issue preclusion test.

*Dare v. Jenkins* (*In re Jenkins*), 607 B.R. 270, 284–85 (Bankr. N.D. Tex. 2019) (internal quotations omitted).

20. Thus, other than the indebtedness which is established by the valid and subsisting judgment, no other facts arise from the State Court Litigation which are binding upon the parties.

*Texas Law*

21. Generally speaking, a corporate officer's acts on a corporation's behalf are deemed to be acts of the corporation. *Leitch v. Hornsby*, 935 S.W.2d 114, 117–18 (Tex.1996).

22. Without reference to any alter ego theory, however, Texas common law has long recognized that a corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation and is acting with the course and scope of his employment. *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002); *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984); *Cage v. WorldFab, Inc.* (*In re Technicool Sys., Inc.*), 594 B.R. 663, 671 (Bankr. S.D. Tex. 2018).

23. Under such circumstances, Texas common law has traditionally held it unnecessary that the "corporate veil" be pierced in order to impose personal liability upon that officer, as long as it is shown that the corporate officer knowingly participated in the wrongdoing. *Kingston,* 82 S.W.3d at 758; *Walker v. Anderson,* 232 S.W.3d 899, 918 (Tex. App. – Dallas 2007, no pet.); *Kwasneski v. Williams (In re Williams)*, 2011 WL 240466, at *1 (Bankr. W.D. Tex., Jan. 24, 2011).

24. However, a split has recently arisen among Texas courts of appeals regarding whether revised Section 21.223 of the Texas Business Organizations Code has preempted the common law regarding an individual's direct tort liability for intentional wrongdoing by an actor in a corporate capacity. *Compare*, *TecLogistics, Inc. v. Dresser-Rand Group, Inc*., 527 S.W.3d 589, 596 (Tex. App.—Houston [14th Dist.] 2017, no pet.) [finding no individual liability for corporate officer who admittedly created false invoices for corporation due to plaintiff's failure to address statutory requirement of § 21.223 that such fraud was "perpetrated primarily for her

personal benefit"]; *and R.P. Small Corp. v. Land Dep't, Inc.*, 2020 WL 7230719, at *9 (S.D. Tex. Dec. 7, 2020); *with Spicer v. Maxus Healthcare Partners, LLC*, 2020 WL 7394223, at *44 (Tex. App.—Fort Worth Dec. 17, 2020, no pet. h.) *and Bates Energy Oil & Gas v. Complete Oilfield Services*, 361 F. Supp. 3d 633, 666 (W.D. Tex. 2019) [rejecting rationale expressed in *TecLogistics*].

25. Absent a decision by the Supreme Court of Texas to address the impact of § 21.223 upon the common law jurisprudence in this area, *Miller* and *Leyendecker* remain sound law and the common law principle that an individual acting as a corporate agent may be held individually liable for knowingly engaging in tortious conduct retains its viability.

*Nondischargeability under Section 523(a)(2)(A):*
*Debt Arising by Fraud, False Pretenses, or False Representation.*

26. The Plaintiffs' Complaint seeks a determination that the debt owed to them should be excepted from discharge under § 523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

27. 11 U.S.C. § 523(a)(2)(A) of the Bankruptcy Code provides that:
    a discharge under § 727 of this title does not discharge an individual debtor from any debt for money, property, or services,

    ... to the extent obtained by false pretenses,
    a false representation, or actual fraud, other
    than a statement respecting the debtor's or
    an insider's financial condition.

28. Section 523(a)(2)(A) of the Bankruptcy Code encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions, the Fifth Circuit has distinguished the elements of "actual fraud" and of "false representations." *RecoverEdge,* 44 F.3d at 1291.

29. The distinction recognized by the Fifth Circuit appears to be a chronological one—resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier* (*In re Bercier*), 934 F.2d 689, 692 (5th Cir. 1991) [concluding that a debtor's promise ... related to a future action which does not purport to depict current or past fact... therefore cannot be defined as a false representation or a false pretense].

30. Because any representation by the Defendant on behalf of his company regarding the future construction and delivery of the automated safety hitch, or either Plaintiff's expectations arising therefrom, pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

31. Thus, the validity of the Plaintiffs' claim under § 523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by actual fraud.

32. To have a debt excepted from discharge pursuant to the "actual fraud" provision of § 523(a)(2)(A), an objecting creditor must prove that:

    (1) the debtor made representations;
    (2) at the time they were made the debtor knew they were false;
    (3) the debtor made the representations with the intention and purpose to deceive the creditor;
    (4) the creditor justifiably relied on such representation; and
    (5) the creditor sustained losses as a proximate result of the representations.

33. It is widely recognized that "[a] promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached." *Allison v. Roberts* (*In re Allison*), 960 F.2d 481, 484 (5th Cir. 1992).

34. A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Beshears v. McCool* (*In re McCool*), 2019 WL 4781338, at *11 (Bankr. N.D. Tex. Sept. 30, 2019) (citing *Allison*, 960 F.2d at 484).

35. As one court has summarized,

    > It is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under § 523(a)(2)(A). Was it otherwise, almost any debt arising out of a failure to complete a contract would be nondischargeable and that is clearly not the way the statute is written or intended. Instead, to be actionable as fraud, the plaintiff must establish that the debtor entered into the contract with the intent of never complying with its terms.

*Strominger v. Giquinto* (*In re Giquinto*), 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008).

36. Because the Court concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that the debt evidenced by the State Court Default Judgment was obtained by actual fraud, judgment must be rendered for the Defendant on this § 523(a)(2)(A) claim.

37. Thus, all relief requested in the Plaintiffs' Complaint in the above-referenced adversary proceeding shall be denied.

38. To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

39. An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 02/08/2021

*[signature]*

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE